FILED IN OPEN COURT
DATE: 3/8/2013
Amee C
DEPUTY CLERK

IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

UNITED STATES OF AMERICA

v.

MICHAEL WAYNE HARDING

Criminal No. 3:12CR00024

# STATEMENT OF FACTS

The offense(s) described below occurred within the Western Judicial District of Virginia. This Statement of Facts briefly summarizes the facts and circumstances surrounding the defendant's criminal conduct. It does not necessarily contain all the information obtained during this investigation and applicable to an accurate Presentence Report and Sentencing Guidelines calculation.

**Introduction:**

Michael Wayne HARDING ("Harding") resided at 3268 Heathcote Lane, Keswick, Virginia 22947. Until August of 2011, HARDING was a licensed real estate agent in the Commonwealth of Virginia, most recently employed at Real Estate III as an independent contractor. HARDING is sole owner of HMC Holdings, LLC. HARDING created HMC Holdings, LLC to acquire, sell, and develop real estate. HARDING engaged in several fraudulent schemes during the course of his real estate business and subsequent personal and business bankruptcy proceedings.

**Real Estate Related Frauds and Embezzlements**

*(Filing of Forged Land Documents)*

The first fraudulent scheme involved the filing of forged land documents in the Albemarle County, Virginia Circuit Court related to a property that HMC Holdings, LLC acquired on July 24, 2008. The property, known as the "Badger-Powhatan" property, consists of 17.4 acres and is located at 4257 Seminole Trail, Charlottesville. HMC Holdings acquired the Badger Powhatan Property for $2.75 million. HARDING valued this property at $5.8 million in June of 2011. This property is currently the only property owned by HMC Holdings, LLC.

When purchasing and developing Badger-Powhatan, HARDING financed the purchase with loans that included the following:

1

- July, 2009: $1 million from Blue Gill, LLC, which was secured by the entire 17.4 acre property. A lien was recorded.
- October, 2009: $500,000 from F.F. White. This loan was secured by the entire 17.4 acre property. A lien was recorded
- August, 2010: $340,000 from Kerry Hall. This loan was a secured by a lien on 4.75 acres of the property. A lien was recorded
- July, 2008: Approximately $2.75 million from Vision Mortgage. Vision Mortgage is a private lending company. This was secured by the entire 17.4 acre property. A lien was recorded but not until January of 2011.
- February, 2010: $300,000 from Simeon Investments. This was secured by a lien on 4.75 acres of the property. A lien was recorded

HARDING had also previously obtained $450,000 in services from W.A. Stratton, Inc. In order to secure that debt, HARDING, on December 14, 2009, provided Stratton a deed of trust secured by the entire 17.4 acre property at Badger-Powhatan that was recorded on January 27, 2010. W.A. Stratton had provided HARDING construction services on a previous project separate from Badger-Powhatan.

In order to secure these deeds of trust, HARDING filed several forged certificates of partial satisfaction with the Albemarle County Circuit Court. These certificates gave successive lenders the impression that previous loans had been satisfied and that their loan was of a more superior status than it actually was.

On December 10, 2009, one such certificate of partial satisfaction was purportedly executed by F.F. White, and was recorded in the Circuit Court for the County of Albemarle. This certificate purported to release the lien of the deed of trust in the amount of $500,000 with respect to a .60 acre parcel of property. Subsequently, on December 10, 2009, HMC Holdings transferred .60 acres of the property located at Badger-Powhatan to the Albemarle County Service Authority as part of a deal between HMC Holdings, LLC (HARDING) and the Albemarle County Service Authority.

The signature of White on the release of lien is purportedly notarized by Jo Ann ADDISON, manager of Real Estate III and sworn notary. On November 3, 2011, Jo Ann Addison was subjected to a deposition in the City of Charlottesville regarding the case of *Jefferies v. HMC Holdings*, CL11-107, a case pending at the time in Albemarle County Circuit Court. These proceedings were recorded. Addison was under oath during these proceedings.

Addison testified that although she notarized the document, she did not realize that she notarized F.F. White's signature on the release of lien. She testified under oath that she thought she was only notarizing HARDING's signature as the document was in a stack of documents that she was notarizing all at once. White did not appear in front of her to sign the document and did not communicate with her. HARDING told her that she was merely notarizing his signature. However, Addison testified that upon examining the

2

document, she recognized HARDING's handwriting and it appeared that HARDING had signed White's name.

On December 8, 2011, Charlie Smith testified under oath before the Circuit Court for the County of Albemarle in the case of *Jeffries v. HMC Holdings*. Smith, who was a close associate of F.F. White, also knew HARDING. At the hearing, Smith testified that he overheard a conversation between HARDING and White in December, 2010. Smith was in White's office, which was located behind the BP Station in Fork Union, along with Charles O'Brien.

Smith further testified that during the conversation, HARDING identified himself and that Smith recognized HARDING's voice. White confronted HARDING about the fact that someone had forged his name on a document regarding the former Badger Fire Station building on Route 29. HARDING stated that it was HARDING who forged his name on the document.

On December 8, 2011, Charles O'Brien testified before the Circuit Court for the County of Albemarle in the case of *Jeffries v. HMC Holdings*. O'Brien was a bookkeeper for F.F. White. O'Brien also knew HARDING. At the hearing, O'Brien testified that he overheard the conversation between HARDING and White in December, 2010. O'Brien was in White's office behind the BP Station in Fork Union, Virginia, along with Charlie Smith.

O'Brien further testified that during the conversation, HARDING identified himself and that O'Brien recognized HARDING's voice. White confronted HARDING about the fact that someone had forged his name on a document securing White's loan with the Badger-Powhatan property. HARDING conceded that he knew that the signature was not White's signature. When HARDING addressed who forged White's signature, he stated "I did."

In 2010, HARDING attempted to sub-divide the Badger-Powhatan property in order to sell portions of it. HMC Holdings, LLC recorded a subdivision plat which purported to subdivide the 17.4 acre property into two parcels, other than the .60 parcel sold to the Albemarle County Service Authority. These two parcels were 4.75 acres and 12.05 acres, respectively.

On March 29, 2010, a certificate of partial satisfaction was purportedly executed by Frayser Francis White, III on behalf of Blue Gill, LLC and was recorded at deed book 3867 page 372 in the Circuit Court for the County of Albemarle. This certificate purported to release the lien of the deed of trust in the amount of $500,000 with respect to a 4.75 acre parcel of property. During the trial of *Jeffries v. HMC Holdings* on December 8, 2011, Frayser Francis White, III testified that the signature that appeared on the certificate that purported to be his was a forgery.

On April 5, 2010, a certificate of partial satisfaction was recorded releasing the lien in its entirety. During the bankruptcy hearing on June 13, 2011, HARDING testified under oath that this certificate of partial satisfaction recorded April 5, 2010 in the Albemarle County Circuit Court Clerk's office purportedly executed by Frayser Francis White, III on behalf of Blue Gill, LLC was forged and of no effect.

The signatures of Frayser White, III on the releases of lien and certificates of partial satisfaction were purportedly notarized by Jo Ann Addison. During her deposition on November 3, 2011, Jo Ann Addison testified that although the document was notarized by her, she did not realize that she notarized "Francis Frayser White, III's" (*sic*) signature on the release of lien. She testified that she thought she was only notarizing HARDING's signature as the document was in a stack of roughly 30 or 40 documents that she would notarize all at once. Frayser White, III did not appear in front of her to sign the document and did not communicate with her. HARDING told her that she was merely notarizing his signature. However, Addison testified that upon examining the document, she recognized HARDING's handwriting and it appeared that HARDING had signed Frayser White, III's name.

In August 2010, Frayser White, III discovered that his name had been forged on certificates of satisfaction purporting to release Blue Gill's liens on 4257 Seminole Trail. Soon thereafter he met with HARDING in person and showed him the documents. HARDING told Frayser White, III that he needed them in a hurry and "didn't have the time to run around everywhere." HARDING stated "people do this all of the time and I just signed them." HARDING admitted that he signed and therefore forged the certificates.

On January 11, 2010, in the Albemarle County Circuit Court Clerk's office a certificate of partial satisfaction was recorded with regard to a .60 acre parcel that is a portion of Badger Powhatan. This certificate permitted HARDING to sell a portion of the Badger-Powhatan property to the Albemarle County Service Authority. This portion is the same parcel discussed earlier for which HARDING forged F.F. White's signature.

During the bankruptcy hearing on June 13, 2011, HARDING testified under oath that the certificate of partial satisfaction dated December 10, 2009, and recorded January 11, 2010, in the Albemarle County Circuit Court Clerk's office with regard to a .60 acre parcel that is a portion of Badger Powhatan purportedly executed by Frayser Francis White, III on behalf of Blue Gill, LLC, LLC was forged and of no effect.

In April of 2010, a certificate of partial satisfaction was purportedly executed by William Stratton and was recorded in the Circuit Court for the County of Albemarle. This certificate purported to release the lien of the deed of trust belonging to Stratton in the amount of $450,000 with respect to a 4.75 acre parcel of property. During the Bankruptcy hearing on June 13, 2011, HARDING admitted that this certificate of partial satisfaction was forged. As of March 2012, HARDING had not repaid this debt.

The signature of Stratton on the release of lien was purportedly notarized by Jo Ann Addison. During her deposition on November 3, 2011, Jo Ann Addison testified under oath that although the document was notarized by her, she did not realize that she notarized Stratton's signature on the release of lien. She testified that she thought she was only notarizing HARDING's signature as HARDING was sitting in front of her signing the documents at the time. Stratton did not appear in front of her to sign the document. HARDING told her that she was merely notarizing his signature. However, Addison testified that upon examining the document, she recognized HARDING's handwriting and it appeared that HARDING had signed Stratton's name.

The trial conducted by the Albemarle County Circuit Court in December, 2011 in part concerned these certificates of partial satisfaction that purported to release in part deeds of trust that secured loans payable to W.A. Stratton. At the conclusion of the trial, the Court ruled that those certificates of satisfaction were forgeries.

During a Bankruptcy hearing on June 13, 2011, HARDING stated under oath that the reason for the filing of the forged certificates of partial satisfaction regarding the .60 acres because the property was being subdivided. The release was necessary so that the property could be subdivided and sold to Albemarle County Water Authority.

During a Bankruptcy hearing on June 13, 2011, HARDING stated under oath that the reason for the filing of the forged certificates of partial satisfaction regarding the 4.75 acres was that the property was being subdivided. The release was necessary so that the property could be subdivided and sold to Baugh Auto Body for $1.2 million (net) according to a March 2009 contract. During the deposition on March 20, 2012, HARDING testified under oath that Baugh required that the liens from Bluegill and White be released.

Harding also apparently used forged subornation agreements to secure tenants at the Badger Powhatan property. The subornation agreement purported to give the tenants' leases the power to survive a foreclosure proceeding. These agreements contained what were purported to be the signatures of F.F. White and Frayser White, III. The signatures, however, were forged.

*(Submission of Fraudulent Contractor Invoices)*

The second fraudulent scheme involved the submission of fraudulent contractor invoices to obtain draws from loans from private mortgage companies. The first company, Vision Mortgage, loaned funds to HMC Holdings, LLC for use in developing the Badger Powhatan property. HARDING provided security for these loans by providing Vision with a deed of trust on the Badger Powhatan property. Under their agreement, HARDING would submit invoices to Vision and Vision would pay for improvements to the property upon completion of each phase of the improvements.

Vision Mortgage loaned HARDING and HMC Holdings, LLC, $2.7 million to purchase, manage and refurbish the Badger Powhatan building at the property located at Badger Powhatan. Over several months, Vision gave advances to HARDING for the property. Their agreement provided that Vision would fund improvements based upon HARDING's representations that the funds were to be used to improve the Badger Powhatan property.

According to Don Burch, who worked for Vision as a loan officer, he inspected checks that HARDING obtained for the improvements to the Badger-Powhatan property. On HARDING's request, a total of $265,000 of VISION Mortgage checks were issued as payable to Richard G. Cromwell Contractors. However, Burch later learned that the checks were then deposited to HARDING'S own accounts, or in one case, the account of Able Insurance. This $265,000 total was paid by Vision to HARDING during the time period between August 5, 2008 and February 11, 2009.

According to Richard Cromwell, Cromwell completed only approximately $20,000 worth of work on the Badger Powhatan property. When Cromwell was shown $265,000 worth of checks made payable to Richard G. Cromwell, Cromwell denied having done anywhere near $265,000 worth of work on the Badger-Powhatan property. Cromwell did not receive, sign over or endorse any check made out to him or his company for HARDING. The signatures on the back of the checks later shown to Cromwell were never in Cromwell's possession nor had he ever seen them. Cromwell maintained that the writing and signatures on the checks were not his. The checks Cromwell received for work provided were primarily from HARDING or HMC Holdings, LLC and not Vision Mortgage.

In April, 2012, a confidential informant spoke to HARDING on the telephone. This conversation was recorded by Special Agent William Talbert of the Virginia State Police. During this conversation, HARDING acknowledged that invoices were submitted to the mortgage company that did not reflect work actually accomplished by the contractors.

Harding engaged in a similar scheme with respect to a second piece of property as well. This property was owned by James Jarman, II. Jarman is the owner and operator of Jarman's Sportscycles, which was located near the Pantops area of Charlottesville, Virginia. Jarman also owned corporations known as Jimco, LLC & Jimco II, LLC. Jarman entered into a Management, Development & Shared Equity Agreement with HARDING to develop a tract of land owned by Jimco II, LLC, identified as parcel number 07800-00-00-033A0 in Albemarle County.

HARDING and Jarman reached an agreement to develop and sell tracts of land next to Jarman's Sportcycles, including the parcel identified above. Crescent Mortgage, the sister company to Vision Mortgage, provided financing for this project. Don Burch was also the loan officer for Crescent Mortgage and also dealt with HARDING in his capacity as an agent for Jimco II.

During the development process, as he had done with respect to the Badger Property, HARDING provided invoices for payment due on contracting services. In particular, HARDING provided invoices to Burch purportedly from J. A. Marshall Construction. Burch later discovered that Marshall had not done the work for which HARDING had provided invoices. Burch discovered that HARDING endorsed the checks as payable to HMC Holdings, his organization and also to Able Insurance. Bank records revealed that these transactions occurred between December 4, 2006 and October 23, 2007.

During an interview with Special Agent Talbert, Jeffrey Marshall stated that he knew nothing about the invoices from J. A. Marshall and check payments totaling over $621,000.00 stemming from apparent work performed at Jarman's property. Marshall did not perform work at Jarman's property, did not endorse any checks to HARDING and did not receive any "kickback" from HARDING. When shown copies of the checks, Marshall advised that the endorsement containing his name was a fake, and that he had neither signed them nor permitted someone else to sign them on his behalf.

Billy Ray White is the principal of Able Insurance Agency. White stated that between 2006 and 2007 he received checks from Crescent Mortgage Corporation's Suntrust Bank account from HARDING. The checks were made payable to J. A. Marshall and J. A. Marshall Contracting and totaled $621,655.00. On the back of the checks was written, "Pay to the order of Able Insurance by J. A. Marshall". White stated that he did not know who J. A. Marshall was.

White stated during an interview with Special Agent Talbert that HARDING brought him the checks and claimed that "J. A. Marshall" was the name of one of HARDING's accounts. HARDING asked White to deposit the checks in White's account and then provide the funds back to HARDING by check in return. HARDING told White to "round down" the amount of the return check and keep the difference. White left the difference of each check, which totaled several thousand dollars, in the Able Insurance business account after depositing them and kept those funds for himself. White then provided the remaining funds to HARDING per his request. Bank records revealed that HARDING received the vast majority of the $621,655.00.

HARDING always signed the rear of the checks in White's presence. HARDING claimed that he needed White to cash the checks for him using White's account because the checks would be held too long in HARDING'S account and he needed the funds as soon as possible. HARDING was able to get cash from White's checks right away.

Record reviews conducted by Special Agent Talbert revealed that, during the time period that HARDING was engaged in these fraudulent contract invoice submissions, HARDING engaged in several lavish purchases, including $443,500 in purchases of race horses in 2007 alone.

*(Embezzlement Related to the Jarman Property)*

  The third scheme HARDING engaged in was an embezzlement related to the development of the Jarman property. HARDING, acting as a real estate agent for Jarman, JIMCO, and JIMCO II, formed a sale contract to sell additional Jarman property to Kai Thrane, a Pennsylvania businessman operating as TCMS, Inc. Under the terms of the contract, Thrane was to purchase property owned by Jarman on Route 250 East in the County of Albemarle Virginia near the interchange with Interstate 64 for $1,700,000.00. Thrane and HARDING communicated via telephone and electronic mail about the purchase during the time period when HARDING was in Virginia and Thrane was in Pennsylvania.

  For settlement, Thrane provided $250,000.00 as a down payment: $50,000.00 at first, $100,000.00 a week before settlement and another $100,000.00 all made out to Hasbrouck Real Estate (later known as Real Estate III). In a contract to purchase dated October 25, 2006, signed by Thrane, Jarman and HARDING, HARDING'S home address appeared in the section where the seller's address would otherwise be inserted. On paperwork directing where payment of a note for $90,000.00 should be sent, HARDING crossed out 610 W. Rio Road, the address for Vision/Crescent Mortgage, and changed the address to 300 Preston Ave, which is Real Estate III. Four payments by Thrane on the note totaling $70,000.00 were sent to Real Estate III, formerly known as "Hasbrouk Realty," as instructed by HARDING.

  HARDING added "Hasbrouck Realty" to the "pay to the order of" line on the checks which were originally made out to Jimco by Thrane. The back of one of the checks was endorsed "payable to HMC Holdings" by HARDING. The other two were endorsed "payable to Able Insurance by Mike Harding" and "payable to Able Insurance by Jimco II". As part of the deal, Thrane was given an adjacent property, to be conveyed back upon settlement, for no consideration. Thrane believed $55,000.00 of the money he paid was being applied to the note, but it was not. Another check for $15,000.00 was made out to Jimco II and HARDING also diverted it to himself. HARDING embezzled these four checks, totaling $70,000 between 8/12/2008 and 5/19/2009.

  HARDING also engaged in a similar embezzlement with regard to the development of a property known as Zion Station, which is located in Fluvanna County in the Western District of Virginia. Bank records revealed that on May 19, 2011, Central Virginia Electric Cooperative issued a check in the amount of $55,227.61 to JAZAN company, a party in the Zion Station project, care of HARDING, who was acting as agent on the project. As he had done with Thrane's checks to Jarman, HARDING diverted CVEC's check to JAZAN to himself without authorization from JAZAN.

**Bankruptcy-related Frauds and Perjuries**

HARDING also engaged in several instances of fraud and perjury during the course of his bankruptcy proceedings, both in a personal and business capacity. These proceedings implicated many of the previously mentioned schemes, particularly those involving the Badger Powhatan property.

During 2011, HARDING sought bankruptcy protection in Federal Court in Charlottesville, Virginia. This case was assigned a case number of USBC Case #11-61062. On June 13, 2011, the United States Bankruptcy Court in Charlottesville conducted a 341 Meeting regarding HARDING's bankruptcy, USBC Case #11-61062. Margaret Garber conducted the hearing as counsel for the United States Trustee. HARDING was present and Garber examined HARDING regarding his Chapter 11 bankruptcy case. HARDING was under oath during these proceedings.

On March 20, 2012, HARDING submitted to a deposition regarding the bankruptcy proceedings in the City of Charlottesville, Virginia. These proceedings were recorded. HARDING was under oath during these proceedings.

During the Bankruptcy hearing on June 13, 2011, HARDING testified under oath that he borrowed $500,000 from F.F. White, II and executed a promissory note that was due and payable October 1, 2010. On October 6, 2009, a deed of trust was recorded in deed book 3805 page 415 at the Albemarle County Circuit Court securing the promissory note in the amount of $500,000. The entire 17.4 acre parcel owned by HMC Holdings located at 4257 Seminole Trail was pledged as security for the $500,000 obligation to F.F. White. During the Bankruptcy hearing on June 13, 2011, HARDING admitted under oath that this certificate of partial satisfaction was forged.

During the Chapter 11 proceeding, HARDING was a debtor in Chapter 11 and was required to file Monthly Operating Reports ("MOR's") with the Office of the United States Trustee and the United States Bankruptcy Court. The MOR's were filed under penalty of perjury pursuant to Section 1746 of Title 28 of the United States Code. HARDING knowingly certified that each of the MOR's were true, accurate and complete.

During the Chapter 11 proceeding, HARDING was obligated pursuant to a Court order to close all bank accounts opened prior to the bankruptcy filing, to deposit all income earned by him into a Debtor-In-Possession bank account and to follow all guidelines, regulations and directives of the Office of the United States Trustee pertaining to Chapter 11 cases.

The information provided by HARDING in his MOR's was material to his bankruptcy case. The statements made with regard to income earned by HARDING, or entities controlled by him, and payments made on behalf of the defendant were false. These statements and information provided in the MOR's were knowingly and fraudulently made by HARDING. HARDING filed or caused to be filed such MORs in his personal bankruptcy for the months of April, May, June, July, August, September, and December 2011, as well as, January, February,

March, and April of 2012. Bank records revealed that HARDING misreported his income and expenditures on each and every one of these MORs.

HARDING continued to maintain undisclosed bank accounts opened prior to the bankruptcy filing, failed to deposit all income earned into the Debtor-in-Possession bank account, opened additional bank accounts without approval from the United States Trustee and the United States Bankruptcy Court and transferred income without permission or authority to do so and concealed income earned by him throughout the pendency of the Chapter 11 case. From April 15, 2011 to December 21, 2011, bank records revealed that HARDING had $123,398.16 of income that he had not disclosed in the monthly operating reports covering the same time period. Of that amount, all but $3,800 had been withdrawn after his April 22, 2011 filing. Similarly, from January 1, 2012 to April 24, 2012, bank records revealed that HARDING had $51,070.01 of income that he had not reported to the Trustee as required.

On June 13, 2011, during a Section 341 hearing, in response to questioning by counsel for the bankruptcy trustee under oath, HARDING testified falsely that he had been made aware that signatures were forged on releases of liens and deeds of trust pertaining to certain property subject to creditor liens when, point in fact, HARDING himself had forged the signatures. These forged signatures, had they gone undetected, would have invalidated certain creditor liens on the property.

In addition, on that same date during that same Section 341 hearing, HARDING testified falsely that he only had an interest in one pre-petition bank account, that he had ceased using the one pre-petition bank account and that he was and would be depositing all income earned into his Debtor-in-Possession bank account. HARDING'S bank records revealed this testimony was false.

On May 22, 2012, the bankruptcy case of HARDING was converted to a Chapter 7 Bankruptcy Case pursuant to Title 11 of the United States Code. On or about June 29, 2012, in connection with the Chapter 7 proceedings, HARDING testified falsely that he did not have an active personal bank account during the pendency of his Chapter 11 bankruptcy case and that no funds were contained within that account during the Chapter 11 proceedings. HARDING's bank records revealed this testimony to be false.

On July 16, 2012, HARDING caused HMC Holdings, LLC to file a Voluntary Chapter 11 Bankruptcy Petition, Case Number 12-61648, pursuant to Title 11 of the United States Code. On September 7, 2012, HARDING testified at a Section 341 hearing for HMC Holdings, LLC. At that hearing, HARDING testified that he had not maintained a personal bank account for several years. HARDING'S bank records revealed this testimony was false, and that, in fact, he had used a personal bank account bearing his name only to provide a retainer to his personal bankruptcy attorney, Marshall Slayton.

On September 7, 2012, HARDING testified that HMC Holdings, LLC had not paid any attorney's fees on behalf of HARDING during his personal Chapter 11 bankruptcy proceedings.

10

HARDING'S bank records revealed this testimony was false, and that, in fact, he provided a retainer to his attorney, Marshall Slayton using his HMC account.

On September 7, 2012, HARDING testified that he had only one tenant at the Badger Powhatan property, a company called ProBuild. In reality, there was a second tenant, a company called Niitek, that was also a tenant at the Badger Powhatan property. HARDING never reported this tenant to the United States Trustee. HMC Holdings continued to receive payments from Niitek and ProBuild even after HARDING's arrest in September 2012, which were unreported to the United States Trustee.

On August 30, 2012, HARDING, by and through his counsel, caused HMC Holdings LLC to file a motion for sale of the Badger Powhatan Property on US Route 29 North of Charlottesville. In the motion for sale, HMC Holdings LLC averred that the sale was to be made to an entity called Development Management IV, LLC. Lane Bonner was a partner in Development Management IV. On or about September 7, 2012, HARDING testified falsely that he had "no relationship" with Lane Bonner. In reality, Lane Bonner was a partner with HARDING in Carysbrook, LLC, to which HARDING had previously admitted under oath during previous Section 341 hearing testimony for his personal bankruptcy, both on June 13, 2011, and again on June 29, 2012. Further, HARDING later admitted, upon creditor cross examination, that Lane Bonner was paying for his bankruptcy attorney. Moreover, HARDING later admitted, upon creditor cross examination, that Lane Bonner had previously received a deed of trust on the Badger Powhatan property, inferior to that of the other creditors in HMC Holdings, LLC and HARDING'S bankruptcies, in the same dollar amount as the amount purported to be the deposit made by Development Management IV, LLC to purchase the Badger Powhatan property pursuant to the motion for sale. Lane Bonner corroborated his extensive relationship with HARDING and the structure of this attempted sale.

On or about September 7, 2012, MICHAEL WAYNE HARDING testified that he had not caused HMC Holdings, LLC to pay any person or entity other than creditors to HMC Holdings, LLC. However, a review of his bank records revealed that the business made payments from its Wells Fargo Bank account to such entities as the Greenbrier, Foods of All Nations, Tobacco Express, Cavalier Diner, Virginia Wine Warehouse, the Palms Casino in Turks and Caicos, and Stub Hub.com. These purchases totaled over $38,000.

On April 24, 2012, HARDING opened a business account under the name HMC Holdings, LLC at Virginia National Bank, which is headquartered in Charlottesville, Virginia, in the Western District of Virginia. On July 12, 2012, HARDING wrote a check from an account under the name of Carysbrook, LLC, at Union First Market Bank, into the HMC Holdings, LLC account at Virginia National Bank.

On July 13 and 14, 2012, HARDING made $17,769.92 worth of withdrawals from his HMC Holdings, LLC account at Virginia National Bank. These transactions consisted of the following:

      a. July 13, 2012: A check written to Virginia National Bank in the amount of $868

      b. July 13, 2012: A check written to Michael Harding from Michael Harding in the amount of $3750

      c. July 13, 2012, 3:44 a.m.: Online payment to Capital One in the amount of $2672.05

      d. July 13, 2012, 2:11 a.m.: Online payment to Citi Card in the amount of $6777.76

      e. July 14, 2012: A check written to Michael Harding from Michael Harding in the amount of $825

Capital One's consumer credit card operations are located in Salt Lake City, Utah. Citi Card's consumer credit card operations are located in Columbus, Ohio.

On July 16, 2012, representatives of Union First Market Bank contacted representatives of Virginia National Bank and advised that the July 12, 2012, $24,200 check written by HARDING off of the Union First Market Bank Carysbrook account to the Virginia National Bank HMC Holdings account was worthless.

I have reviewed the above statement of facts with my attorney and I agree that it is true and accurate. I further agree that the above facts are sufficient to convict me beyond a reasonable doubt of the offenses to which I am pleading guilty.

3/8/13
Date

                              Michael Wayne Harding
                              Defendant

3/8/13
Date

                              William C. Dinkin
                              Attorney for Defendant

FOR THE UNITED STATES ATTORNEY'S OFFICE:

                              TIMOTHY J. HEAPHY
                              UNITED STATES ATTORNEY

_____  8 MAR 2013
Matthew J. Quatrara
Special Assistant United States Attorney